# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| CLORISSA D. PORTER and WILLIAM D. SPENCER, on behalf of themselves and all those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SOUTHERN NEVADA ADULT MENTAL HEALTH SERVICES, et al.,<br><br>Defendants. | Case No. 16-cv-02949-APG-PAL<br><br>**ORDER GRANTING MOTION TO DISMISS IN PART AND DENYING WITHOUT PREJUDICE MOTION FOR CLASS CERTIFICATION**<br><br>(ECF Nos. 22, 38) |

Plaintiffs Clorissa D. Porter and William D. Spencer bring this putative class action against Southern Nevada Adult Mental Health Services (SNAMHS), also known as Rawson-Neal Psychiatric Hospital, and numerous individuals employed by the state of Nevada. In their first amended complaint, the plaintiffs allege violations of the Fourth, Eighth, and Fourteenth Amendments under 42 U.S.C. § 1983; Title II of the Americans with Disabilities Act (ADA); and the Emergency Medical Treatment and Active Labor Act (EMTALA). All of the defendants move to dismiss the complaint.[1] Because the named plaintiffs are barred by the applicable statutes of limitations, I grant the motion in part. However, because Porter and Spencer seek to bring this case as a class action, I grant leave to amend to substitute new named plaintiffs that are not subject to the statutes of limitations bar, if they exist.

The plaintiffs also filed a motion for class certification while the defendants' motion to dismiss was pending.[2] I deny the plaintiffs' motion as premature; the plaintiffs may refile it after proper plaintiffs have been substituted and a second amended complaint has been filed.

---

[1] Defendant Linda White had not been served when the other defendants filed this motion. She filed a joinder to the motion on June 9, 2017. ECF No. 36.

[2] ECF No. 38.

# I.    BACKGROUND

## A.    Allegations

The plaintiffs allege that Rawson-Neal engages in a policy or practice of involuntarily discharging mentally ill, indigent patients on anti-psychotic medications, placing them in taxis bound for the local Greyhound station, and providing them with bus tickets to cities throughout the United States, where the patients often have no contacts or plans for alternative care. Plaintiff Porter alleges that she was involuntarily discharged on January 9, 2013, transported to the Greyhound bus station, and given a pre-paid bus ticket to Flint, Michigan. While she was given enough anti-psychotic medication for the two-day bus ride, she was given no food or money for the trip. The defendants told her that they had made arrangements for her care in Cora, Michigan, a city at least two hours away from Flint, but did not provide her with a way to get there. Rawson-Neal allegedly never contacted the facility in Cora to arrange for care. Porter had no contacts in Flint and had no funds for food or transportation to Cora. She experienced a mental breakdown and was admitted to a Michigan hospital, which was unable to obtain her medical records from Rawson-Neal.[3]

Plaintiff Spencer was admitted to Rawson-Neal in August 2012. After a few weeks at the facility, a psychiatrist—noting that Spencer used to live in Glendale, California—informed Spencer that he would be provided a bus ticket to Los Angeles. The psychiatrist told Spencer that after the Greyhound dropped him off in Los Angeles, he should "call 9-1-1" for help. Spencer refused the proposed discharge plan and stated that he had no intention of returning to California. The psychiatrist discharged Spencer approximately one month later, telling him that he would be sent to a "residential aftercare facility" in Pasadena where he would receive further treatment. Spencer was transported to the bus station, was given a bus ticket to Los Angeles, and was told that staff from the Pasadena facility would pick him up once he arrived in Los Angeles. When he arrived after the eight-hour trip, without money or food, he called the facility in Pasadena and was informed that Rawson-Neal never provided them with any information about him or his arrival

---

[3] ECF No. 6 at 10-11.

and they had no space for him at the facility. After experiencing a severe panic attack, Spencer

became homeless for approximately one week until he was able to connect with family members.[4]

Porter and Spencer seek to represent similarly situated persons who were former patients

of Rawson-Neal and were subjected to these alleged discharge procedures. They allege that the

hospital's actions violate their Fourth, Eighth, and Fourteenth Amendment rights, as well as Title

II of the ADA, and EMTALA's prohibition on "patient-dumping."

**B.    The *Brown* action[5]**

This is not the first time these allegations have been raised before the District Court of

Nevada. On June 11, 2013, plaintiff James Brown filed a putative class action raising the same

causes of action brought here.[6] Judge Mahan granted the defendants' motion to dismiss the

allegations on the merits before class certification was determined, and gave Brown an

opportunity to amend his complaint.[7] Instead, Brown filed a motion for reconsideration, which

Judge Mahan denied.[8] Brown did not amend his complaint despite two extensions of time to do

so. On July 24, 2014, Judge Mahan dismissed the case with prejudice for failure to comply with

court orders as a sanction under Federal Rule of Civil Procedure 41(b).[9] Judge Mahan did not

address the class nature of the complaint in either the merits dismissal or the 41(b) dismissal.

Brown appealed to the Ninth Circuit, but did not mention the 41(b) ruling in his opening

brief, instead arguing that Judge Mahan's dismissal on the merits was erroneous. On November

4, 2016, in a 2-1 split decision, the Ninth Circuit found that it could not reach the merits in light

---

[4] ECF No. 6 at 11-13.

[5] I take judicial notice of the proceedings in *Brown*, as they are directly related to the matter at issue here. Fed. R. Evid. 201; *Trigueros v. Adams*, 658 F.3d 983, 987 (9th Cir. 2011).

[6] *See Brown v. So. Nev. Adult Mental Health Servs.*, Case No. 2:13-cv-01039-JCM-PAL; ECF No. 24-2.

[7] ECF No. 24-2, Ex. C.

[8] *Id.*, Ex. E–F, I.

[9] *Id.*, Ex. K.

of the final 41(b) dismissal.[10]  The court also held that Brown waived any argument against the 41(b) dismissal by not raising it in his opening brief.[11]  The plaintiffs in this case filed their complaint on December 21, 2016, the day the Ninth Circuit's mandate in *Brown* issued.[12]

## II.  **DISCUSSION**

### A.  **Motion to Dismiss Standard**

When deciding a motion to dismiss, I must view the facts in the complaint as true and in a light most favorable to the plaintiffs.[13]  Rule 8 requires factual support amounting to more than mere labels and recitations of the claim's elements.[14]  I may draw reasonable inferences from the facts in the complaint but I cannot rely on legal conclusions to find that a claim is properly pleaded.[15]  I must dismiss any cause of action that does not state a plausible claim for which relief can be granted.[16]  A complaint or individual claim should be dismissed without leave to amend only when "it is clear . . . that the complaint could not be saved by amendment."[17]

I cannot dismiss a claim based on an affirmative defense unless the elements of the defense are clear on the face of the complaint.[18]  When a statute of limitations issue is clear on the face of the complaint, then a defendant can argue that defense in a motion to dismiss.[19]  If it is clear from the face of the complaint that the statute of limitations has passed, then I must determine whether "the assertions of the complaint, read with the required liberality, would not

---

[10] *Brown v. Rawson-Neal Psychiatric Hosp.*, 840 F.3d 1146, 1148 (9th Cir. 2016) ("[T]he case was dismissed as a sanction under Rule 41(b), and [] in light of that, the Rule 12(b)(6) order[] [is] not reviewable.").

[11] *Id.*

[12] *See* ECF No. 24-2, Ex. O.

[13] *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000).

[14] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[15] *Id.*

[16] *Id.* at 679.

[17] *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998).

[18] *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 901 (9th Cir. 2013).

[19] *Id.*

permit the plaintiff to prove that the statute was tolled."[20]  Further, I find it appropriate here to resolve the motion to dismiss before ruling on class certification.[21]

## B.    Statute of Limitations

### 1.    Limitations periods

State law applies in 42 U.S.C. § 1983 actions "to determine what the limitations period is, whether that period was tolled, and the effect of the tolling."[22]  Both parties agree that Nevada's two-year statute of limitations for personal injury actions applies to the plaintiffs' § 1983 claims.[23]  EMTALA claims are subject to a two-year statute of limitations based on federal law.[24]

Title II of the ADA "borrow[s] the statute of limitations applicable to the most analogous state-law claim."[25]  The plaintiffs argue in their response to the motion to dismiss that Nevada's "catch-all" four-year statute of limitations should apply.[26]  However, in their motion for class certification, the plaintiffs appear to agree with the defendants that Nevada Revised Statutes § 651.070, Nevada's disability discrimination statute related to public accommodations, is analogous to Title II, and therefore its one-year limitations period applies.[27]  I agree that a claim under § 651.070 is most closely analogous to the ADA.[28]  Therefore, § 651.070's one-year statute of limitations applies to the plaintiffs' ADA claim.

---

[20] *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999) (citations omitted).

[21] *See Wade v. Kirkland*, 118 F.3d 667, 670 (9th Cir. 1997) ("[I]n some cases, it may be appropriate in the interest of judicial economy to resolve a motion for summary judgment or motion to dismiss prior to ruling on class certification.").

[22] *Chardon v. Soto*, 462 U.S. 650, 654 (1983).

[23] *See* Nev. Rev. Stat. § 11.190(4)(e).

[24] *See* 42 U.S.C. § 1395dd(d)(2)(C).

[25] *Sharkey v. O'Neal*, 778 F.3d 767, 768 (9th Cir. 2015).

[26] *See* Nev. Rev. Stat. § 11.220.

[27] Nevada Revised Statutes § 651.070 provides that "all persons are entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages and accommodations of any place of public accommodation, without discrimination or segregation on the ground of . . . disability. . . ."  Nevada Revised Statute § 651.090 provides a private right of action for violations of § 651.070.  The limitations period under § 651.090 is "1 year from the date of the act complained of." Nev. Rev. Stat. § 651.120.

[28] *See Belssner v. Nevada*, Case No. 2:15-cv-00672-APG-PAL, 2017 WL 2990848, at *2 (D. Nev. July 12, 2017).

1    The defendants argue that the named plaintiffs cannot maintain this action because they

2    are barred by all relevant statutes of limitations.  Porter claims that she was involuntarily

3    discharged on January 9, 2013.  Spencer alleges that he was discharged on September 21, 2012.

4    Therefore, the two-year limitations period for the EMTALA and § 1983 claims would have

5    expired on January 9, 2015, and September 21, 2014, respectively.  The plaintiffs' ADA claims

6    would have expired on January 9, 2014, and September 21, 2013, respectively.  Absent tolling, all

7    of Porter and Spencer's claims are time-barred.

8                    **2.**        ***American Pipe* tolling**

9          The plaintiffs argue that the class action tolling principles established by the United States

10   Supreme Court in *American Pipe Construction Company v. Utah*[29] toll this action for the

11   pendency of the *Brown* class action, in which they allege they were putative members.  Under the

12   *American Pipe* doctrine, "the commencement of a class action suspends the applicable statute of

13   limitations as to all asserted members of the class who would have been parties had the suit been

14   permitted to continue as a class action."[30]  "Once the statute of limitations has been tolled, it

15   remains tolled for all members of the putative class until class certification is denied" or until a

16   case is otherwise stripped of its class action character.[31]  Accordingly, the Ninth Circuit has held

17   that a class action can toll the statute of limitations for a subsequent class action when the new

18   class is "not attempting to re-litigate an earlier denial of class certification, or to correct a

19   procedural deficiency in an earlier would-be class."[32]

---

[29] 414 U.S. 538 (1974).

[30] *Id.* at 554.

[31] *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354 (1983).

[32] *Catholic Soc. Servs., Inc. v. INS*, 232 F.3d 1139, 1149 (9th Cir. 2000); *see also Resh v. China Agritech, Inc.*, 857 F.3d 994, 1004 (9th Cir. 2017)(stating that "the statute of limitations does not bar a class action brought by plaintiffs whose individual actions are not barred" under *American Pipe*), *cert. granted*, -- S.Ct. --, 2017 WL 4224769 (Mem) (2017).  On December 8, 2017, the Supreme Court granted certiorari in *Resh* to determine whether subsequent class actions get the benefit of *American Pipe* tolling. If the Supreme Court reverses *Resh* and rules that *American Pipe* tolling applies only to subsequent interveners and individual actions, then this case cannot go forward as a class action.

For actions under § 1983 and Title II of the ADA, I borrow state tolling principles.[33]  In *Roe Dancer v. Golden Coin, Ltd.*, the Supreme Court of Nevada held that the filing of a class action suspends the running of the statute of limitations against class members' claims.[34]  While Nevada courts have not expressly determined whether the rules established in *American Pipe* and its progeny apply, *Roe Dancer* relied on a District Court of Nevada opinion that extensively cited that case and related precedent as support for its tolling rule.[35]  Thus, I find that the reasoning of *American Pipe* is applicable to the plaintiffs' § 1983 and ADA claims, as well as the federal EMTALA claim.

Both parties agree that the *Brown* action tolled the plaintiffs' statute of limitations for some period of time.[36]  The plaintiffs argue that tolling continued while Brown's appeal was pending.  The defendants argue that the statute of limitations resumed running when Judge Mahan dismissed *Brown* with prejudice.  If the plaintiffs are given the benefit of tolling through the Ninth Circuit's decision, this action would be timely.  If the limitations period was tolled only through Judge Mahan's dismissal with prejudice under FRCP 41(b), then the plaintiffs' claims are untimely.[37]

The defendants argue that the case essentially ceased to be a class action when it was dismissed with prejudice for Brown's failure to comply with court orders and Brown was no longer representing the class when he appealed the case's dismissal.  They analogize this circumstance to cases in which the district court denied class certification that was appealed, and the uncertified members of that class then sought tolling through that appeal in a subsequent class action.  The majority of circuit courts have held that, in such a circumstance, tolling ends when

---

[33] *TwoRivers,* 174 F.3d at 992.

[34] *Roe Dancer v. Golden Coin, Ltd.*, 176 P.3d 271, 275 (Nev. 2008).

[35] *Id.* (citing *Bonilla v. Las Vegas Cigar Co.*, 61 F. Supp. 2d 1129, 1135 (D. Nev. 1999)).

[36] *See* ECF No. 22 at 5; ECF No. 24 at 12.

[37] This result is the same for all claims, regardless of the shorter limitations period for the ADA claims.

the district court denies class certification or otherwise "strip[s] the suit of its class action character,"[38] regardless of any attempts to appeal.[39]

The Ninth Circuit and Nevada courts have not considered whether the tolling period for a proposed class action should extend through the appeal of the dismissal of individual claims before class certification is decided. Nor have they affirmatively agreed with most other circuits that the time during appeal of a district court's denial of class certification does not count toward tolling. However, in this case, I am persuaded that the principles of tolling established in *American Pipe* and related precedent weigh in favor of the determination that tolling stopped when Judge Mahan dismissed *Brown* with prejudice.

*American Pipe*'s class action tolling rule is "grounded in the traditional equitable powers of the judiciary."[40] The Supreme Court balanced the class action's "purpose of litigative efficiency and economy" with a statute of limitation's purpose of "ensuring essential fairness to

---

[38] *American Pipe*, 414 U.S. at 561; *see also Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*, 642 F.3d 560, 563 (7th Cir. 2011) (tolling ends whenever a suit ceases to be a class action because of an adverse ruling, voluntary withdrawal, or "perhaps because the defendants buy off the original plaintiff as soon as the statute of limitations runs, hoping to extinguish the class members' claims"); *Leyse v. Bank of Am., Nat. Ass'n*, 538 F. App'x 156, 161 (3d Cir. 2013) (unpublished) ("[T]he Supreme Court's pronouncement that class action tolling ends when class certification is denied does not require a formal motion for class certification, or any district court ruling on class certification."); *Guy v. Lexington-Fayette Urban Cty. Gov't*, 488 F. App'x 9, 20-21 (6th Cir. 2012) (unpublished) ("[t]he commencement of a class action tolls the applicable statute of limitations for all unnamed members of the class until certification is denied or the case is otherwise dismissed without being certified").

[39] *See, e.g.*, *Giovanniello v. Alm Media, LLC*, 726 F.3d 106, 117 (2d Cir. 2013) ("If the Court had contemplated that tolling continued through the pendency of reconsideration or through appeal, there would be no need for class members to take action to protect their rights."); *Taylor v. UPS, Inc.*, 554 F.3d 510, 519 (5th Cir. 2008) ("Therefore, it is clear . . . that if the district court denies certification under Rule 23, tolling of the statute of limitations ends."); *Bridges v. Dep't of Md. State Police*, 441 F.3d 197, 211 (4th Cir. 2006) ("[T]he statute of limitations 'remains tolled for all members of the putative class until class certification is denied for any reason.") (quotation omitted); *Yang v. Odom*, 392 F.3d 97, 102 (3d Cir. 2004) ("Here, there is no basis for extending applicable tolling through the pendency of [the previous actions'] appeal . . . ."); *Culver v. City of Milwaukee*, 277 F.3d 908, 914 (7th Cir. 2002) ("When a suit is dismissed without prejudice or when class certification is denied the statute resumes running for the class members."); *Stone Container Corp. v. United States*, 229 F.3d 1345, 1355-56 (Fed. Cir. 2000); *Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374 (11th Cir. 1998); *Fernandez v. Chardon*, 681 F.2d 42 (1st Cir. 1982); *Andrews v. Orr*, 851 F.2d 146 (6th Cir. 1988).

[40] *Cal. Pub. Emps. Ret. Sys. v. ANZ Sec, Inc.*, 137 S. Ct. 2042, 2052 (2017).

defendants and of barring a plaintiff who has slept on his rights"[41] to determine that tolling applied to putative class members who sought to intervene as named plaintiffs after class certification was denied. In *Crown, Cork & Seal*, that same balancing justified the application of tolling to putative class members who filed their own individual actions following the denial of class certification.[42]

Most circuit courts have recognized that those equitable considerations do not apply with the same force when considering whether tolling should apply through an appeal for uncertified class members.[43] Those courts determined that extending tolling through the appeal for uncertified class members "is unnecessary to protect any *reasonable* reliance by putative class members on their former class representatives."[44]

The plaintiffs give me no strong reasons to deviate from the rulings in those other circuits. Also, the *Brown* appeal did not impact the class claims. Rather, it was limited to Judge Mahan's dismissal as a Rule 41(b) sanction. The plaintiffs acknowledge this distinction, arguing that the "victory on appeal in *Brown* was merely a procedural victory on individual claims as opposed to a victory on the merits of putative class claims."[45] The appeal was concerned with Brown's failure as an individual plaintiff to prosecute his case. A reasonably prudent putative class member seeking to protect his rights would have filed a new lawsuit at the time of Judge Mahan's dismissal. The principles articulated in *American Pipe* do not support allowing the putative class members to benefit from the two years that Brown's individual claims were pending on appeal.

---

[41] *American Pipe*, 414 U.S. at 554 (quotation and citation omitted).

[42] *Crown, Cork & Seal*, 462 U.S. at 350-354.

[43] *See e.g.,* note 39, *supra*; *see also Lopez v. Liberty Mut. Ins. Co.*, 2015 WL 3630570, at *9 (C.D. Cal. Mar. 6, 2015) ("[A] majority of the Circuit Court of Appeals have held that this tolling ends when a class is decertified or a case is dismissed, even if the decision is appealed.").

[44] *Armstrong*, 138 F.3d at 1381 (emphasis in original); *see, e.g., Taylor*, 554 F.3d at 520 (stating it was logical to conclude that "after the district court's denial of certification, the putative class members had no reason to assume that their rights were being protected"); *Bridges*, 441 F.3d at 211 ("no absentee class member could reasonably have relied on the named plaintiffs, nor the district court, to protect their interests in the period following the district court's" denial of class certification for reasons other than the merits).

[45] ECF No. 24 at 16.

The plaintiffs cite to *Catholic Social Services v. INS*[46] and *Taylor v. UPS*[47] to argue that the putative class members can benefit from tolling through the appeal of a previous class action. In both of those cases, the putative class members attempting to bring suit were *certified* members of the previous class action. Both courts specifically relied on the members' previous certified status to justify tolling through appeal. The Fifth Circuit in *Taylor* noted that while "members of a certified class are to be treated essentially as named plaintiffs [for the purposes of tolling on appeal] . . . when the requirements of Fed. R. Civ. P. 23 are met[,] . . . the same result does not flow for members of a putative class that has not been certified."[48] The Ninth Circuit in *Catholic Social Services* distinguished its facts from other cases disallowing tolling on appeal partially because the class members in *Catholic Social Services* were certified in their previous class action, and therefore were entitled to tolling.[49] Here, the putative class in *Brown* was never certified and therefore does not benefit from the reasoning in *Catholic Social Services* and *Taylor*. Thus, I find that any class action tolling that accrued as a result of *Brown* ended when the case was dismissed with prejudice, at which point the clock on the putative class members' claims began to run again.

### 3.    Equitable Tolling

The plaintiffs next argue that I should apply general equitable tolling principles to extend tolling through the *Brown* appeal. They contend that Judge Mahan improperly dismissed *Brown* without first "permit[ting] class members an opportunity to substitute themselves as the class representative" in order to protect the interests of the class.[50] The plaintiffs argue that dismissing the case with prejudice "left the putative class to languish without a representative plaintiff, and without the ability to amend the existing complaint to replace the representative plaintiff, whose

---

[46] 232 F.3d at 1149.

[47] 554 F.3d at 521.

[48] *Id.* at 517.

[49] *Catholic Soc. Servs.*, 232 F.3d at 1148-1149.

[50] ECF No. 24 at 18 (citing *Roe Dancer*, 176 P.3d at 275).

individual claims had been dismissed."[51]  They contend that the district court should have "issued an order after Plaintiff Brown appealed that made clear that a stay over the putative class members' claims existed during the duration of the appeal."[52]  They further contend that waiting to file a new action until the appellate proceedings concluded was reasonable because they "reasonably believ[ed] that the resolution of the appeal would provide a controlling outcome for their own claims" and therefore any new action "may have been subject to collateral estoppel/issue preclusion."[53]  The plaintiffs add that they chose to wait until the appeal concluded "rather than burdening the court with the filing of a successive action that Plaintiff Brown and the putative class believed would be reinstated on appeal."[54]

In the absence of controlling Nevada authority for the application of equitable tolling principles for § 1983 claims, the plaintiffs urge me to apply Nevada's equitable tolling test adopted by the District Court of Nevada in *Wisenbaker v. Farwell*.[55]  There, a prior proceeding was dismissed without prejudice and subsequently refiled after the expiration of an applicable statute of limitations.  The court held that, in an instance where a dismissal without prejudice becomes "tantamount to a dismissal with prejudice because of the expiration of the statute of limitations," tolling could be warranted.[56]

That is not what happened here.  *Brown* was dismissed with prejudice, the putative class members benefitted from tolling throughout the pendency of that case, and they then failed to file a new complaint within their extended limitations period.  It is unclear whether Nevada's equitable tolling principles would apply to this scenario.

---

[51] ECF No. 24 at 18.

[52] ECF No. 24 at 18 n.6 (citing *Roe v. SFBSC Mgmt., LLC*, Case No. 14-cv-03616-LB, 2015 WL 1798926, at *5 (N.D. Cal. Apr. 17, 2015) ("[T]he court rules that the statute of limitation is tolled for the putative class during the pendency of the appeal."); *Bryant v. Wal-Mart Stores, Inc.*, Case No. 08-cv-5221-SI, 2012 U.S. Dist. LEXIS 130327, at *2-3 (N.D. Cal. Sep. 12, 2012) (putative class "stayed for over three years" pending resolution of relevant appellate case)).

[53] ECF No. 6 at 4.

[54] ECF No. 24 at 19.

[55] 341 F. Supp. 2d 1160, 1164 (D. Nev. 2004).

[56] *Id.* at 1166.

1    Assuming the equitable tolling factors articulated in *Wisenbaker* apply, the plaintiffs do

2    not satisfy them.  As relevant here, two of the equitable tolling factors I consider are "(1)

3    plaintiff's diligence and (2) [] the prejudice [d]efendant would endure if the statute of limitations

4    were tolled."[57]

5        The plaintiffs have not shown diligence in protecting their rights.  After *Brown* was

6    dismissed with prejudice, the putative members may not have been able to intervene to preserve

7    their class claims.  But, the plaintiffs have not shown that there was anything stopping them from

8    seeking to intervene or substitute the named plaintiff after Judge Mahan first dismissed the

9    complaint on the merits without prejudice.  The plaintiffs had five months between the court's

10   initial order of dismissal with leave to amend and the final sanction of dismissal to ensure that the

11   class claims would survive.  There is no indication that the plaintiffs moved to enter a stay of the

12   putative class claims during that time or took any other action to preserve their rights.  The

13   plaintiffs' confidence that *Brown*'s appeal would come out differently does not excuse the lack of

14   due diligence in making sure that the earlier class claims were not lost while the appeal was

15   pending.

16       The plaintiffs' attempt to refrain from filing duplicitous actions was not justified where

17   there was no indication that the Ninth Circuit would rule on the merits of the claim or reverse the

18   district court.  The only appealable order in *Brown* was the dismissal with prejudice as a Rule

19   41(b) sanction, not the dismissal on the merits.  It was unreasonable for these named plaintiffs,

20   represented by the same experienced attorneys who represented *Brown* in the previous action, to

21   believe that the Ninth Circuit would ignore the sanctions dismissal, reach the merits of the case,

22   and reverse Judge Mahan's order and remand for further class proceedings.  While I appreciate

23   the desire to refrain from filing successive lawsuits, the diligent course of action would have been

24   to file this suit upon Judge Mahan's dismissal of *Brown*, and move to consolidate the actions if

25   the Ninth Circuit reversed.  Because I find that the plaintiffs have not shown due diligence

26   sufficient to allow equitable tolling, I decline to address the potential prejudice to the defendants.

27   _____

28   [57] *Id.* at 1166 (citing *Copeland v. Desert Inn Hotel*, 673 P.2d 490, 492 (Nev. 1983)).

## 4.    Continuing Violations

Finally, the plaintiffs contend that tolling is available under the continuing violations doctrine.  To benefit from continuing violations tolling in the § 1983 context, a plaintiff must show "a series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during [that] period."[58]  Because the plaintiffs allege a continuing custom, policy, or practice of unconstitutional action against Rawson-Neal and the defendants, they contend that the continuing violations theory should save their claims.[59]

The named plaintiffs, however, do not allege that Rawson-Neal or any of the defendants have engaged in continuing violations against them.  Indeed, the complaint affirmatively alleges that the violations against Porter and Spencer concluded in 2012 and 2013, when they were involuntarily discharged and transported to other states.  The plaintiffs appear to argue that because the defendants continue to violate the law by maintaining the same policies and practices that initially harmed the named plaintiffs, and those policies still may harm other potential members of the class, the named plaintiffs' statute of limitations are tolled because the policy itself is continuing.  "If the court were to accept plaintiffs' argument, each time a class action were filed, there would be effectively no time limitations in civil rights suits"[60] that allege ongoing custom, policy or practice claims.  "[I] can find no authority . . . for allowing one plaintiff to revive a stale claim simply because the allegedly [unconstitutional] policy still exists and is being enforced against others."[61]  The plaintiffs' continuing violations argument does not revive their claims.

---

[58] *Gutowsky v. County of Placer*, 108 F.3d 256, 259 (9th Cir. 1997).

[59] ECF No. 24 at 21-22.

[60] *Robinson v. Caulkins Indiantown Citrus Co.*, 701 F. Supp. 208, 212 (S.D. Fla. 1988).

[61] *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1221–22 (11th Cir. 2001) (citing *Woodburn *1222 v. LTV Aerospace Corp.,* 531 F.2d 750, 751 (5th Cir. 1976); *Miller v. Int'l Tel. & Tel. Corp.,* 755 F.2d 20, 25 (2d Cir. 1985) ("[S]everal courts have held that an employee who has been discharged pursuant to a discriminatory policy may not take advantage of later discriminatory acts against other employees for the purpose of postponing the running of the statutory period as to him on a continuing violation theory.")).

**5.      Leave to amend complaint to substitute lead plaintiff**

In their motion for class certification, the plaintiffs contend that patients currently confined or recently discharged may be part of their proposed class. While the representative plaintiffs discussed in the certification motion all appear to be time-barred, it is possible that there are class members who fall within the statutory period, particularly when taking into account the benefit of tolling that accrued while *Brown* was pending in the district court. Therefore, while I grant the defendants' motion to dismiss the complaint on statute of limitations grounds as to Porter and Spencer, I do so with leave to amend the complaint to substitute appropriate representatives who are not time-barred. In anticipation of a second amended complaint, I address defendants' other arguments for dismissal both to address futility and to provide guidance on amendment.

**C.      Fourth Amendment Seizure Claims**

The plaintiffs allege that defendants Whitley, Phinney, Szklany, Malay, Ravin, Gallofin, Schubert, and White, all state actors, "use[d] . . . coercion, physical force or show of authority, [and] restrained or restricted" plaintiffs and the putative class members' freedom of movement. These defendants allegedly "misrepresented services allegedly arranged for [the plaintiffs], then involuntarily discharged them, placed them into taxis for transport to Greyhound buses, and required them to board these buses for transport out of state while under the influence of powerful psychiatric medications for severe mental illness that rendered them incapable of informed consent."[62] The plaintiffs contend that these "compelled transports, under the circumstances, were coercive in nature and implemented with voluntary consent."[63]

To establish that a "seizure" has occurred pursuant to the Fourth Amendment, a plaintiff must allege (1) that he was subjected to a use of physical force or a demonstration of state authority and (2) that he reasonably believed he was not free to leave.[64] "A person is 'seized'

---

[62] ECF No. 6 at 18.

[63] *Id.*

[64] *Cal. v. Hodari D.*, 499 U.S. 621, 628 (1991).

within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."[65] Examples of circumstances that might indicate coercion or a demonstration of state authority could include "the threatening presence of several officers, the display of a weapon by the offic[ial], some physical touching of the person of the citizen, or the use of language or time of voice indicating that compliance with the office[ial's] request might be compelled."[66] "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized."[67]

The defendants argue that the plaintiffs' allegations do not state a Fourth Amendment claim because the plaintiffs do not allege that they were detained or controlled by any state defendant when they were discharged from the hospital.[68] The plaintiffs do not allege that they were accompanied to the Greyhound station by any defendant or compelled, once they were there, to get on a specific bus. According to the defendants, the allegations show only that the plaintiffs were placed into a taxi with a pre-paid bus voucher, which they contend is insufficient to show the use of coercive state authority.

The plaintiffs respond that the complaint alleges that the defendants knew the patients were mentally ill, medicated, and homeless, and "ordered" them discharged from the hospital, "escorted" and "placed" them into taxis destined for the Greyhound station without adequate discharge planning, and "required" them to board the buses for transport. They provide two cases that they contend show a state actor's commands (like those alleged here) can constitute a sufficient show of authority to implicate Fourth Amendment rights. In *Benson v. City of San Jose*, the Ninth Circuit determined that there was a triable issue as to whether an unlawful seizure occurred where a police officer "retained Benson's identification card . . . and told [Benson] to

---

[65] *U.S. v. Mendenhall*, 446 U.S. 544, 554 (1980).

[66] *Id.*

[67] *U.S. v. Drayton*, 536 U.S. 194, 201 (2002).

[68] ECF No. 22 at 6.

get on [a] bus."[69]  There, the officer's commands amounted to a "show of official authority" which "transformed what may have begun as a consensual encounter into a seizure."[70]  In *Hoyer v. DiCocci*, a mentally ill plaintiff was told by a police officer to go to a psychiatric hospital.[71] She voluntarily left her apartment and boarded an ambulance, and was kept at the hospital for a few hours for evaluation.  While the plaintiff was not psychically restrained and did not physically resist, she maintained that she was nonetheless involuntarily hospitalized because she clearly and repeatedly refused her consent, but she "felt she had 'no choice' about leaving her apartment because" of the officer's representations that he could have her involuntarily committed for 72 hours if she did not comply.[72]  The District Court of Connecticut held that a reasonably jury under those circumstances could find that the officer used a show of authority to seize the plaintiff.  Based on those cases, the plaintiffs argue that the complaint sufficiently alleges that they were subject to "coercive state authority" that restrained their movement.

Here, a reasonable inference can be drawn indicating that the state defendants used their authority to coerce the mentally ill plaintiffs by telling them that they were discharged from the facility and that the defendants had made arrangements for alternative care at another location, then putting them on taxis headed to the bus station and telling them to take specific buses out of the state (for which the defendants gave them a pre-paid ticket) to receive that alternative care. Considering all of the circumstances, including that the plaintiffs were suffering from mental illness and allegedly on "powerful anti-psychotic/tranquilizing medication,"[73] it is plausible that a reasonable person would not feel free to deviate from the defendants' plan to provide alternative care.  The plaintiffs' allegations are sufficient to state a Fourth Amendment seizure claim.

---

[69] 583 F. App'x 604, 605-06 (9th Cir. 2014).

[70] *Id.* at 606.

[71] 457 F. Supp. 2d 110, 116 (D. Conn. 2006), *rev'd on qualified immunity grounds*, 224 F. App'x 103 (2d. Cir. 2007).

[72] *Id*.

[73] ECF No. 6 at 2.

### D. Eighth Amendment Claim

Plaintiffs allege that the defendants demonstrated deliberate indifference to the physical and psychological needs of their patients and effectively "banished" them from the state of Nevada in violation of the Eighth Amendment's prohibition on cruel and unusual punishment.[74]

The Eighth Amendment applies "only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions."[75]  Other situations "may be sufficiently analogous to criminal punishments in the circumstances in which they are administered to justify application of the Eighth Amendment."[76]  The United States Supreme Court has not yet decided "whether or in what circumstances persons involuntarily confined in mental or juvenile institutions can claim the protection of the Eighth Amendment."[77]

To allow the plaintiffs to proceed on this claim, I would have to find as a matter of law that involuntarily committed individuals can claim Eighth Amendment protections and that those protections extend to the methods in which those individuals are discharged from state care.  I am not willing to stray so far from the Eighth Amendment's previously recognized limits.

The plaintiff's banishment argument also misses the mark.  "The Supreme Court most recently explained that banished offenders historically could not 'return to their original community,' and that the banishment of an offender 'expelled him from the community.'"[78]  Further, banishment has always been discussed in relation to criminal offenders, in keeping with the general proposition that the Eighth Amendment applies only to criminal punishments and

---

[74] ECF No. 24 (citing *Dear Wing Jung v. United States*, 312 F.2d 73, 76 (9th Cir. 1962) ("[B]anishment" is "either a 'cruel and unusual' punishment or a denial of due process of law.  Be it one or the other, the condition is unconstitutional.")); *see also Klapprott v. United States*, 335 U.S. 601, 611-12 (1949) (concurring opinion) (stating that exile is consistent with "the most cruel penalty of banishment," and "is a penalty thus far unknown to our law and at most but doubtfully within Congress' power").

[75] *Ingraham v. Wright*, 430 U.S. 651, 671-72 (1977).

[76] *Id*. at 669 n.37.

[77] *Id*.

[78] *Doe v. Miller*, 405 F.3d 700, 719 (8th Cir. 2005) (citing *Smith v. Doe*, 528 U.S. 84, 92 (2003)).

1    analogous state conduct.  The plaintiffs have not demonstrated that the facts alleged in the first

2    amended complaint sufficiently state an Eighth Amendment claim.

3        **E.    Procedural Due Process**

4        Plaintiffs allege they have a constitutional liberty interest "against being involuntarily

5    discharged without voluntary consent or any form of notice, hearing, or means of challenging the

6    involuntary discharge."[79]  They also allege property interests found in various state statutes (Nev.

7    Rev. Stat. §§ 433.314 and 433A.400) and federal regulations (42 C.F.R. §§ 482.43, 489.24(e) and

8    45 C.F.R. § 205.10).[80]  Procedural due process analysis proceeds in two steps: "[I] first ask

9    whether there exists a liberty or property interest of which a person has been deprived, and if so

10   [I] ask whether the procedures followed by the State were constitutionally sufficient."[81]

11       The defendants first note that Nevada law provides for a hearing when a patient is

12   involuntarily admitted to a mental health facility,[82] but does not provide similar protections for a

13   patient's discharge.  The defendants conclude from this state law omission that the plaintiffs are

14   not entitled to a hearing before being involuntarily discharged.  However, the absence of a state

15   law providing a right to hearing does not answer the question of whether an individual is entitled

16   to some form of procedural due process under the Fourteenth Amendment.  If there exists a

17   liberty or property interest, "the due process clause requires fair procedures for its vindication,"[83]

18   regardless of what state law may otherwise provide.

19       The defendants next "ask this court to review [Nev. Rev. Stat. §§ 433A.400 and 433.314]

20   to determine whether either statute contain[s] mandatory language and predicates"[84] that confer a

21   state-created liberty or property interest.  State statutes and regulations can create property

22

23       [79] ECF No. 6 at 20.

24       [80] *Id.*

25       [81] *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (citing *Kentucky Dept. of Corr. v. Thompson*, 490
     U.S. 454, 460 (1989)).

26       [82] *See* Nev. Rev. Stat. § 433A.220.

27       [83] *Swarthout*, 562 U.S. at 220.

28       [84] ECF No. 22 at 9.

interests entitled to due process protections when a state places "substantive limits on official discretion."[85] A state substantively limits official discretion "by establishing 'substantive predicates' to govern official decision-making . . . and, further by mandating the outcome to be reached upon a finding that the relevant criteria have been met."[86] Not all mandatory statutory or regulatory provisions confer due process entitlements. For instance, just because a statute contains mandatory language for government officials, it does not necessarily create a property interest for affected groups.[87] The state's use of guidelines to "structure the exercise" of discretion does not necessarily create a protected interest because a "residuum of restraint on an otherwise 'unfettered' discretion is not determinative of whether a protected interest is created."[88]

Section 433.314 sets forth the duties for the Commission on Behavioral Health to adopt policies "to ensure adequate development and administration of services for persons with mental illness . . . and for the care and treatment of persons with mental illness." The defendants state that this statute "does not appear to create any predicates which require a particular substantive outcome for the purpose of the procedural due process claim."[89] I agree. Nothing in the text of § 433.314 requires state officials to adopt certain policies or limits discretion regarding what those policies must include. The plaintiffs do not state a property or liberty interest under § 433.314.

Section 433A.400 sets out specific procedural requirements for discharging indigent mental health patients. The statute requires that an indigent resident of Nevada who suffers from a "residual medical or surgical disability which prevents him or her from obtaining or holding remunerative employment" must be returned to the county of his or her last residence upon

---

[85] *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983).

[86] *Thompson*, 490 U.S. at 462.

[87] *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 764-65 (2005) (Colorado law mandating that police "shall use" every reasonable means to enforce a restraining order did not create personal entitlement to police enforcement of a restraining order).

[88] *Roberts v. Spaulding*, 783 F.2d 867, 870 (9th Cir. 1986) (citations omitted).

[89] ECF No. 22 at 10.

discharge. An indigent nonresident with such disabilities must be returned to the county from which he or she was involuntarily committed, unless the nonresident can be delivered to a legal guardian or "an individual or agency authorized to provide further care."[90]

The defendants first argue that the plaintiffs fail to allege that they suffered from a medical or surgical disability requiring treatment, such that § 433A.400 would not apply to them. The plaintiffs allege that they were still in need of psychiatric care when they were involuntarily discharged.[91] This sufficiently alleges that § 433A.400 applies to the plaintiffs.

Alternatively, the defendants argue that the purpose of § 433A.400 is to ensure that Clark and Washoe counties "are not billed for the medical care of indigent patients simply because the psychiatric hospital is located within one of those counties" and the statute was not intended to establish policies to protect patients when they are discharged from Rawson-Neal.[92] The defendants offer no authority for that argument, so I will not consider it. It is also inappropriately raised at this stage in the proceedings, where I do not consider facts not pleaded in the complaint. Nor do the defendants raise any arguments contending that the language in § 433A.400 does not create the property interest the plaintiffs allege. However, it is unclear from the first amended complaint what property interest the plaintiffs allege they have in § 433A.400. On amendment, the plaintiffs may wish to flesh out what entitlements or benefits they believe § 433A.400 creates a protectable property interest in.

The only argument the defendants offer to discount the plaintiffs' property interest in certain federal regulations is that they "have been unable to find any authority to support or explain how a federal regulation could create a privately enforceable right under the 14th Amendment."[93] However, the Ninth Circuit has long recognized that due process property rights can be conferred through federal regulations written to implement public benefits authorized by

---

[90] Nev. Rev. Stat. § 433A.400.

[91] ECF. No. 6 at 2.

[92] ECF No. 22 at 10-11.

[93] ECF No. 22 at 9-10.

statute.[94]  Because the defendants offer no argument as to why the specific regulations cited by the plaintiffs do not confer any due process rights, at this stage the plaintiffs have stated a procedurally protected interest under the federal regulations they cite.  Again, however, the plaintiffs may wish to add allegations to their complaint specifying what property interest they contend the federal regulations create, as it is unclear from the first amended complaint what "property" they claim they are entitled to.

### F.    Substantive Due Process

#### 1.    State-created danger

The plaintiffs allege that the defendants violated their substantive due process rights by exposing them to dangers they would not have otherwise faced had they not been involuntarily discharged and compelled to leave the state.  "The state's failure to protect an individual against private violence . . . can [violate the guarantee of due process] where the state action 'affirmatively places the plaintiff in a position of danger,' that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced."[95]

The defendants argue that "providing a voucher to travel outside of the state did not place [the plaintiffs] in a more dangerous situation than they would have otherwise faced" because the plaintiffs were homeless in Las Vegas and would have been returned to the streets here, just as they were when they were bused to other cities.

The Ninth Circuit has "specifically rejected the 'danger creation' versus 'danger enhancement' distinction"[96] and instead focuses on whether state action or inaction "place[s] an individual at risk."[97]  The plaintiffs and putative class members allege that they faced enhanced

---

[94] *Nozzi v. Hous. Auth. of City of Los Angeles*, 806 F.3d 1178, 1191 (9th Cir. 2015); *see also U.S. v. Raya-Vaca*, 771 F.3d 1195, 1204 (9th Cir. 2014) ("Although not every violation of a regulation rises to the level of a due process violation, certain regulations may in fact be mandated by the Constitution or federal law.") (citations and quotations omitted); *Klein v. Mathews*, 430 F. Supp. 1005, 1009 (D.N.J. 1977) (applicable federal regulations gave nursing home residents a legitimate entitlement to continued occupancy in a facility that complied with Medicare and Medicaid requirements).

[95] *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (citations omitted).

[96] *See id.* at 1063 n.4.

[97] *Penilla v. City of Huntington Park*, 115 F.3d 707, 710 (9th Cir. 1997).

danger when placed on long bus rides and left in unfamiliar cities without assistance or the provision of alternative care. The plaintiffs have plausibly alleged that, while they may have faced the same kinds of dangers in both places, the defendants' actions exposed them to a greater danger than they otherwise would have faced. That is sufficient to state a due process claim.[98]

## 2. Special relationship

A "special relationship" due process claim may be stated where "a custodial relationship exist[ed] between the plaintiff and the State such that the State assume[d] some responsibility for the plaintiff's safety and well-being."[99] The constitutional duty "arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitations which [the State] has imposed on his freedom."[100] Involuntarily committed psychiatric patients retain a liberty interest in safety.[101] "[I]n the case of custody or involuntary hospitalization," the state can be liable for due process violations "premised on an abuse of that special relationship."[102]

The defendants argue that the plaintiffs' allegations concern deficiencies in discharge or transportation after their release from state custody, so any special relationship ended before the alleged unconstitutional events.[103] However, the plaintiffs do allege that defendants harmed them by failing to take reasonable provision for the plaintiffs' welfare by inadequately preparing for their discharge and transport while they were still in state custody.[104] The plaintiffs have sufficiently alleged that the defendants failed to protect their safety by implementing inadequate

---

[98] *See Brown*, 840 F.3d at 1151-53 (Graber dissenting) (stating that the plaintiffs in the *Brown* action sufficiently stated the same substantive due process claim).

[99] *Henry A. v. Wilden*, 678 F.3d 991, 998 (9th Cir. 2012).

[100] *Deshaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989).

[101] *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 852 n.12 (1998) ("The combination of a patient's involuntary commitment and his total dependence on his custodians obliges the government to take thought and make reasonable provision for the patient's welfare.").

[102] *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992).

[103] ECF No. 22 at 12.

[104] ECF No. 24 at 25.

and unsafe discharge plans. Further, the defendants offer no authority for the argument that special relationship protections necessarily end when an involuntarily committed patient is involuntarily discharged. Indeed, the defendants' custodial relationship with the plaintiffs, and the special duties that accompany it, may reasonably extend to include a duty to ensure that the custodial relationship ends in a safe manner. The plaintiffs' allegations are sufficient to state a claim under the special relationship doctrine.

### G. Equal protection – wealth discrimination

The plaintiffs allege that the defendants discriminated against indigent patients on the basis of their wealth. On information and belief, they claim that Rawson-Neal involuntarily discharged and transported out-of-state patients who could not afford Rawson-Neal's services, while retaining or arranging appropriate discharge for non-indigent plaintiffs.[105]

Because the plaintiffs do not allege that the defendants' conduct was based on their status as a member of a protected class, the minimal "rational basis" level of scrutiny applies to this claim.[106] "In rational-basis review, a statutory classification . . . comes before the [c]ourt bearing a strong presumption of validity, and those attacking its rationality have the burden to negate every conceivable basis that might support it."[107]

The defendants argue that the plaintiffs' discharges were required under Nevada law, and therefore were rational.[108] The defendants contend that, under Nevada Revised Statutes § 433.150, a person with mental illness may be detained for evaluation and treatment for 72 hours. The patient must be released if he does not meet the criteria for a petition for involuntary court ordered admission under § 433A.210 (which requires a finding that the patient poses a risk of imminent harm to himself or others) or unless the person's status is changed to a voluntary admission as described in § 433A.140. Because the plaintiffs "do not assert that they wished to

---

[105] ECF No. 6 at 24.

[106] *See Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 458 (1988) (declining to define a suspect classification based on indigent status).

[107] *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 308 (1993).

[108] ECF No. 22 at 13 (citing Nev. Rev. Stat. §§ 433.150, 433A.210, 433A.140).

remain hospitalized or that they met the criteria of being a danger to themselves or others," then state law required that they be released from state care. The defendants argue that this statutory scheme provides a rationale for the plaintiffs' discharges.

However, § 433.150 does not require that the defendants involuntarily discharge indigent patients without arranging appropriate discharge procedures. The crux of the plaintiffs' complaint is not solely that they were discharged from Rawson-Neal. The plaintiffs take issue with the alleged manner in which indigent patients were discharged. Even if it was required by law that the plaintiffs be discharged, that would not necessarily alter the content of the plaintiffs' claim. Further, there is no indication that the plaintiffs limit their class only to patients who were discharged after a 72 hour hold pursuant to § 433.150. Indeed, Spencer was at Rawson-Neal for approximately one month before he was discharged, far beyond the reach of § 433.150, indicating that he was either voluntarily or involuntarily admitted and Rawson-Neal was under no legal obligation to discharge him when it did.

The defendants also submit that the majority of patients at Rawson-Neal are indigent and that "no disparate treatment exists based on the inability of a patient to pay."[109] That argument is factual and inappropriate at the motion to dismiss stage. "While, ultimately, Plaintiffs will be required to produce evidence of discriminatory intent or motive in order to prevail on their Equal Protection Claim, it is sufficient at the pleading stage to aver intent generally."[110] Courts are not obligated to blindly accept a defendant's stated rationale at the pleading stage.[111] The plaintiffs have alleged sufficient facts to state an equal protection claim.

---

[109] ECF No. 22 at 13.

[110] *Lewis v. City of Berkeley*, Case No. 08-cv-5089-JCS, 2009 U.S. Dist. LEXIS 271, *23 (N.D. Cal. Jan. 6, 2009).

[111] *See Lazy Y Ranch LTD v. Behrens*, 546 F.3d 580, 590-91 (9th Cir. 2008) ("The Supreme Court has cautioned that 'even the standard of rationality . . . must find some footing in the realities of the subject addressed by the legislation.' Consistent with this admonition, our circuit has allowed plaintiffs to rebut the facts underlying defendants' asserted rationale for a classification, to show that the challenged classification could not reasonably be viewed to further the asserted purpose.").

**H.      ADA**

The plaintiffs allege that the defendants violated the ADA by "exercis[ing] a policy to place an involuntar[il]y committed patient in an unstable, untreated, severe psychiatric condition in a taxi to be placed in a Greyhound on a one-way ticket to another city . . . without arrangements having been made for continuation of care."[112]  The plaintiffs allege that they and the class they seek to represent are "qualified disabled persons under Title II of the ADA" and that Rawson-Neal is a public entity subject to the ADA.[113]

> To state a claim of disability discrimination under Title II, a plaintiff must allege:
>
> (1) [H]e 'is an individual with a disability;' (2) he 'is otherwise qualified to participate in or receive the benefit of some public entity's services, programs or activities;' (3) he 'was either excluded from participation in or denied the benefits of the public entity;' and (4) 'such exclusion, denial of benefits, or discrimination was by reason of his disability.'[114]

A plaintiff is not qualified to bring a Title II claim unless he "meets the essential eligibility requirements of a government service, program or activity provided by a public entity."[115]  "Quite simply, the ADA's broad language brings within its scope anything a public entity does."[116]  The plaintiffs have alleged that they were involuntarily committed at Rawson-Neal, a public entity, and were subject to its discharge planning and transportation decisions.  At this stage, the plaintiffs' allegations suffice to state a claim.

The defendants also note that the plaintiffs' equal protection claims are based on the allegations that the defendant's actions were motivated by the plaintiffs' indigency rather than their mental illness.  Nothing precludes the plaintiffs from arguing that they were discriminated

---

[112] ECF No. 6 at 25.

[113] *Id.*

[114] *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004) (citations omitted).

[115] *Zimmerman v. Oregon Dep't of Justice*, 170 F.3d 1169, 1175 (9th Cir. 1999).

[116] *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001) (internal quotations omitted).

against on the basis of indigency and disability.  Even if the two theories are inconsistent, the plaintiffs are not precluded from pleading both.[117]

### I.      EMTALA

Under EMTALA, a hospital emergency room has a duty to screen a patient for an emergency medical condition and if one is found, a duty to stabilize the patient before a transfer or discharge.[118]  EMTALA provides a private right of action against a "participating hospital" for individuals who suffered personal harm due to a violation of the statute.  EMTALA defines "participating hospital" as "a hospital that has entered into a provider agreement under section 1395cc of this title."[119]

The plaintiffs allege that they suffered from an emergency medical condition during the time they were admitted to Rawson-Neal and the defendants failed to properly stabilize and transport them.  The defendants argue that an EMTALA claim can be brought only against a "participating hospital," and therefore has no application to the named individual defendants.  The plaintiffs agree.  So the plaintiffs cannot state an EMTALA claim against any of the defendants in their individual capacities.

The defendants next argue that, while Rawson-Neal is a "participating hospital" for EMTALA purposes, the cause of action should be dismissed on Eleventh Amendment immunity grounds.  Rawson-Neal, as a facility of Nevada's Division of Public and Behavioral Health, is a state agency.[120]  An exception to the immunity generally enjoyed by states and their instrumentalities may arise when a federal statute clearly expresses Congress' legitimate intent to abrogate such immunity.[121]  EMTALA, however, contains no clear expression of intent to

---

[117] Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims . . . as it has, regardless of consistency.").

[118] 42 U.S.C. § 1395dd.

[119] *Id.* § 1395dd(e)(2).

[120] *See* Nev. Rev. Stat. § 433.233.

[121] *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 55 (1996); *Atascadero State Hosp. v. Scanion*, 473 U.S. 234, 241-43 (1985).

abrogate the states' immunity.[122]  A second exception arises if the state waives its Eleventh

Amendment immunity.  Nevada, however, has expressly refused to waive its Eleventh

Amendment immunity to suit in federal court.[123]  The plaintiffs therefore cannot state a claim

against Rawson-Neal under EMTALA in federal court.

The plaintiffs cite two cases from the District Court of Montana that hold EMTALA

preempts state sovereign immunity statutes.[124]  Neither of these cases engaged in the Eleventh

Amendment analysis required by *Atascadero* and *Seminole Tribe*.  Rather, they held that various

state sovereign immunity statutes prohibiting liability or limiting damages were preempted by

EMTALA.  I find them unpersuasive in this context.

The plaintiffs next argue that while the EMTALA claims against the individual capacity

defendants must be dismissed, those against the official capacity defendants can be maintained to

circumvent the state's Eleventh Amendment immunity.  They rely on the *Ex Parte Young*[125]

doctrine that prospective injunctive and declaratory official capacity claims are unaffected by the

application of the Eleventh Amendment, and can be maintained against state officials accused of

violating federal law.[126]  However, EMTALA specifically limits who can be found liable for

violating it—only participating hospitals can be accused of violating EMTALA, not the state

officials who run it.[127]  In this context, *Ex Parte Young* is inapposite.  The plaintiffs provide no

argument demonstrating why, despite the statute's unambiguous language, *Ex Parte Young*

---

[122] *See* 42 U.S.C. § 1395dd; *see also Drew v. Univ. of Tenn. Reg'l Med. Ctr.*, 211 F.3d 1268, at *3 (6th Cir. 2000) (unpublished) (citing *Lebron v. Ashford Presbyterian Cmty. Hosp.*, 975 F. Supp. 407, 409 (D.P.R. 1997), *Wade v Presbyterian Healthcare Servs.*, 72 F. Supp. 2d 1285, 1290-91 (D.N.M. 1999)).

[123] Nev. Rev. Stat. § 41.031(3).

[124] *See Etter v. Bd. of Trs. of N. Kan. City Hosp.*, 1995 WL 634472, at *2 (W.D. Mo. Oct. 26, 1995); *Helton v. Phelps County Reg'l Med. Ctr.*, 817 F. Supp. 789, 792 (E.D. Mo. 1993).

[125] 209 U.S. 123 (1908).

[126] ECF No. 23 at 27 n.11.

[127] In the private hospital context, at least one court in this circuit has held that directors and other managing employees of the hospital cannot be sued under EMTALA. *Lopes v. Kapiolani Med. Ctr. for Women & Children*, 410 F. Supp. 2d 939, 956-67 (D. Haw. 2005) (granting motion for summary judgment as to Chief Operating Officer and Director of Respiratory Care at defendant hospital because "EMTALA explicitly limits a private right of action to the participating hospital").

applies.[128]  Thus, because Rawson-Neal is protected by state sovereign immunity and none of the other defendants is a "participating hospital," the plaintiffs cannot state an EMTALA claim against any of the defendants.

### J.    Individual Capacity Defendants

#### 1.    Qualified Immunity

Defendants Chelsea Szklany and Dr. Ravin, two of the defendants being sued for individual monetary damages, argue that they are entitled to qualified immunity on the claims against them.  Defendant Linda White is also sued in her individual capacity and presumably joins this argument.[129]

The doctrine of qualified immunity protects government officials from liability for civil damages to the extent their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known at the time of the conduct.[130]  Courts considering whether an official is shielded by qualified immunity consider two questions: first, whether the facts alleged show the officer's conduct violated a constitutional right, and second, whether the right was clearly established.[131]

The defendants provide no more than a vague, unsupported argument about their qualified immunity defense.  Their argument consists of three sentences, alleging (1) they "could not reasonably have believed that their conduct would result in the alleged deprivation of rights," (2) "it is not at all clear that an individual suffers a deprivation of constitutional rights when the individual is released from a psychiatric hospital after having failed to meet criteria for commitment and receiving a voucher which can be used to obtain a bus ticket," and (3) they

---

[128] Indeed, this argument is contained in a one sentence footnote that simply states, "[e]ven if the Eleventh Amendment applies, prospective injunctive and declaratory official capacity claims are unaffected." ECF No. 24 at 27 n.11 (citing *Nat'l Audubon Soc'y v. Davis*, 307 F.3d 835, 846-48 (9th Cir. 2002)).

[129] ECF No. 36.

[130] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

[131] *Id*. at 232.

"would not have reasonably understood that their conduct was unlawful."[132]  I will not provide relief based on these unsupported statements.[133]  Further, given that I am allowing amendment of the complaint I decline to consider the defense at this time.  The defendants may wish to raise a more robust qualified immunity defense later in the proceedings.

## 2.    Individual capacity allegations

Defendants Szklany and Ravin next argue that the plaintiffs fail to allege facts sufficient to state a claim against them.  Defendant White presumably joins this argument as well.  A supervisor can be liable for his "own culpable action or inaction in the training, supervision, or control of his subordinates, his acquiescence in the constitutional deprivations of which the complaint is made, or conduct that showed a reckless or callous indifference to the rights of others."[134]  "Advancing a policy that requires subordinates to commit constitutional violations is always enough for § 1983 liability, no matter what the required mental state, so long as the policy proximately caused the harm."[135]

The plaintiffs allege that "[Defendant Szklany] was the Administrator of care and treatment provided to patients by [the hospital]," "[Defendant Ravin] was Associate Medical Director and responsible for care provided to patients at the [hospital,]" and "[Defendant White] was the Statewide Psychiatric Medical Director of the State of Nevada and . . . was responsible for the supervision and direction of the provision of services at [the hospital]."[136]  They allege that all three defendants, pursuant to their "discharge customs, practices, and policies," "failed to ensure that a comprehensive discharge plan was implemented for patients discharged from the facility and failed to identify patients who were likely to suffer adverse health consequences upon

---

[132] *Id.*

[133] *See e.g., Duenez v. City of Manteca*, Case No. CIV. S-11-1820-LKK-KJN, 2013 WL 6816375, at *10 (E.D. Cal. Dec. 23, 2013) ("[Defendant]'s 15-line qualified immunity argument fairly begs not to be taken seriously.").

[134] *Starr v. Baca*, 652 F.3d 1202, 1205-06 (9th Cir. 2011) (quotations omitted).

[135] *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1076 (9th Cir. 2012).

[136] ECF No. 6 at 6, 8.

discharge without an adequate discharge plan," and "failed to provide an appropriate discharge plan and . . . to ensure a discharge planning evaluation was completed on patients."[137] They sufficiently allege that Szklany, Ravin, and White's failures caused the plaintiffs' harm through their failures to provide adequate discharge policies.

### K. Personal involvement of official capacity defendants

The defendants argue that the plaintiffs' injunctive relief claims are barred by a failure to allege "personal[] involvement" by the defendants named in their official capacities.[138] The defendants appear to be confusing personal capacity liability for damages with official capacity liability for equitable relief. Official capacity suits "represent only another way of pleading an action against an entity of which an officer is an agent,"[139] and "therefore should be treated as suits against the State."[140] "A plaintiff seeking injunctive relief against the State is not required to allege a named official's personal involvement in the acts or omissions constituting the alleged constitutional violation."[141] "Rather, a plaintiff need only identify the law or policy challenged as a constitutional violation and name the official within the entity who can appropriately respond to injunctive relief."[142] The defendants do not argue that any of the official capacity defendants is not in the position to respond to injunctive relief relating to the care of Rawson-Neal patients. Thus, at this stage the plaintiffs have stated a claim against the official capacity defendants for injunctive relief.

## III. CLASS CERTIFICATION MOTION

Because I dismiss the first amended complaint with leave to substitute a named plaintiff and to amend in accordance with this order, I will deny the plaintiffs' motion for class certification without prejudice to refiling after an amended complaint is filed.

---

[137] *Id.* at 16.

[138] ECF No. 22 at 21-22.

[139] *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

[140] *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

[141] *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1127 (9th Cir. 2013).

[142] *Id.*

IV.    **CONCLUSION**

IT IS THEREFORE ORDERED that **the defendants' motion to dismiss [ECF No. 22] is granted in part.**  The claims of plaintiffs Clorissa Porter and William Spencer are barred by the applicable statute of limitations and are therefore dismissed with prejudice.  Because this is a putative class action, I grant leave to file a second amended complaint, consistent with this order, to substitute a named plaintiff whose claims are not time-barred.  The plaintiffs must file and serve a second amended complaint in accordance with this order on or before January 30, 2018.

IT IS FURTHER ORDERED that the **plaintiffs' motion for class certification [ECF No. 38] is denied as premature** with leave to refile after a second amended complaint is filed.  This denial should not be construed to end any applicable tolling that putative class members may benefit from due to the filing of this action.

DATED this 13th day of December, 2017.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE